CARL CHAMNESS, Plaintiff-Appellee, *v.* D. G. ODUM, Defendant-Appellant.

Fifth District   No. 78-412

Opinion filed December 27, 1979.

Mitchell & Brandon, of Carbondale, and Harris & Lambert, of Marion, for appellant.

Rex Carr and David J. Letvin, both of Cohn, Carr, Korein, Kunin, Schlichter and Brennan, of East St. Louis, for appellee.

Mr. PRESIDING JUSTICE JONES delivered the opinion of the court:

Dr. D. G. Odum, a licensed chiropractor, appeals from a judgment of the circuit court of Union County entered on a verdict in favor. of plaintiff, Carl Chamness, in a malpractice action brought by him against defendant Odum. The issues on appeal are: (1) whether the trial court improperly excluded evidence of an alleged admission contained in Chamness' pleadings in his workmen's compensation claim; and (2) whether plaintiff failed to establish the standard of care against which Dr. Odum's treatment of plaintiff was to be measured.

The action brought by Chamness sought damages for personal injuries he allegedly sustained as a result of Dr. Odum's chiropractic treatment of a back injury which plaintiff incurred at work. In his complaint, Chamness alleged that Dr. Odum negligently caused plaintiff to sustain further serious injuries by failing to discover the nature and extent of his injury and/or by manipulating and adjusting plaintiff's back and body "when he knew or should have known that such treatment would injure the plaintiff or aggravate his then-existing injury." The cause was tried before a jury on July 12, 1977, and after hearing the evidence, the jury returned a verdict, holding Dr. Odum liable and assessing damages in the amount of $200,000 in favor of Chamness. The jury also answered in the affirmative a special interrogatory which asked:

"Was the Defendant, D. G. Odum, guilty of negligence which proximately caused or proximately aggravated the injury of the plaintiff Carl Chamness?"

The trial court entered judgment on the verdict, and after defendant's post-trial motions were denied, he commenced this appeal.

Defendant contends first that the trial court erred in excluding evidence of an alleged evidentiary admission made by Chamness in pleadings in his workmen's compensation claim.

Prior to trial, plaintiff Chamness presented a motion in limine seeking to prevent defendant from referring to plaintiff's workmen's compensation claim in any manner. The defendant objected to the motion, arguing that since plaintiff had pleaded that defendant's treatment had either caused plaintiff's injury or aggravated a preexisting injury, he should be allowed to present evidence, as an admission, that plaintiff signed a workmen's compensation pleading stating that he injured his back in an accident at work. After hearing counsels' arguments, the court granted the motion in limine. Defendant argues that this ruling was error. We disagree.

It is the generally accepted rule in Illinois that evidence of workmen's compensation recovery may be properly excluded in an action by an injured employee against a third party. (*Bryntesen v. Carroll Construction Co.* (1963), 27 Ill. 2d 566, 190 N.E.2d 315; *Sweeney v. Max A. R. Matthews & Co.* (1970), 46 Ill. 2d 64, 264 N.E.2d 170.) Although the evidence which defendant sought to have admitted would not have revealed how much the plaintiff received from his compensation claim, we find that the trial court properly excluded it since it had no relevance to plaintiff's claim at trial and could only have served to prejudice his case. See generally *Mangan v. Broderick & Bascom Rope Co.* (7th Cir. 1965), 351 F.2d 24, *cert. denied* (1966), 383 U.S. 926, 15 L. Ed. 2d 846, 86 S. Ct. 930.

Defendant calls our attention to the cases of *Bassi v. Morgan* (1965), 60 Ill. App. 2d 1, 208 N.E.2d 341, and *Korleski v. Needham* (1966), 77 Ill. App. 2d 328, 222 N.E.2d 334, both of which held that admissions contained in workmen's compensation claims were admissible in certain other proceedings. Our examination of these cases reveals that the admissions in those cases had great relevance to issues raised in the other proceedings. Such was not the case here, and consequently the rule of *Bassi* and *Korleski* is inapplicable to the case at bar.

In *Bassi,* the plaintiff brought an action against her employer for injuries arising out of a car accident. The action was based on the theory that plaintiff was a guest passenger in the car driven by her employer at the time of the accident. The defendant asserted as an affirmative defense that the action was barred under the Workmen's Compensation Act because it arose out of and during the course of plaintiff's employment. In support of this defense theory, the defendant offered, but was not allowed, to admit plaintiff's

application under the Act which stated that she was injured in an accident "arising out of and in the course of her employment" by defendant. On appeal, the reviewing court held that the trial court erred in refusing to admit this admission since it was extremely relevant to the question of plaintiff's status as an employee and thus to the absolute defense that plaintiff was injured in the course of her employment by defendant.

In *Korleski*, the plaintiff, who was injured in an automobile collision caused by Harold Needham, deceased, brought an action against the alleged employer of the deceased based on an agency theory, alleging that at the time of the collision Needham was acting in the course of his employment with the defendant company. The trial court admitted an approved industrial commission settlement contract between the defendant company and the deceased's widow in which it was stated that the deceased was killed in an accident that arose out of and while in the defendant's employ. The appellate court held that although this admission was not conclusive as a matter of law, it was properly admitted at trial since it established a prima facie case in favor of plaintiff on the issue of agency.

As these summaries show, the admissions in *Bassi* and *Korleski*, if accurate, would have been conclusive of central issues in those cases, in *Bassi* an affirmative defense, and in *Korleski* the issue of agency. In stark contrast here, the plaintiff's "admission" that he injured his back in an accident at work was not similarly conclusive since it was not inconsistent with the position he took in the malpractice action and thus not an admission.

■■ Plaintiff's position both in his pleadings and at trial was essentially that Dr. Odum's negligent chiropractic treatment aggravated a work related condition, causing additional injuries. The plaintiff never denied that he sustained some injury at work. He stated in his complaint that he slipped and fell on or about September 27, 1973, injuring his back and right leg, and testified at trial to the specifics of the work incident which prompted him to seek defendant's chiropractic care. Since the work incident was undisputed and the injuries for which plaintiff sought to recover were those which resulted from defendant's allegedly negligent chiropractic treatment, the evidence which defendant attempted to admit had no relevance to any issue at trial. Under these circumstances, we find that the trial court properly excluded defendant's evidence relating to plaintiff's workmen's compensation claim.

Defendant's last contention on appeal, that the plaintiff failed to establish the standard of care against which to measure his conduct, is factual in nature and requires a summary of the evidence presented at trial.

Carl Chamness, the plaintiff, testified that in 1968, as a consequence of an accident which occurred to him at work, he was operated on for a ruptured disc in the lower lumbar region of his back. This operation was successful and left a visible scar on plaintiff's back. Plaintiff returned to work

after the operation and did not experience any further back problems until September 1973.

Chamness stated that on September 25 or 26, 1973, as he reached down to pick up a piece of steel at work, he slipped on some grease and felt a sensation in his back like glass breaking in a rag. He sought medical treatment at a hospital in Cairo, Illinois, where he saw a doctor who X-rayed his back, gave him some medication and released him.

Since plaintiff continued to experience pain, he went to Dr. Odum's office in Anna, Illinois, for chiropractic treatment on October 5, 1973. On this occasion the doctor was unavailable, and plaintiff was seen only by the doctor's wife. He told her his problem, and she treated him with some "electric thing." The plaintiff did not see the defendant until October 8, 1973, his third visit to the office. According to plaintiff, he told the defendant that he had extreme pain in his lower back and right hip and was having difficulty in moving his right leg. He told the doctor how he was injured, and the doctor took an X ray of his back. While examining plaintiff, defendant noticed the scar from plaintiff's previous operation which was visible above his shorts, and stated, "It looks as if you have had back problems before." The plaintiff told him that he had a disc removed in 1968. After looking at the X ray, defendant gave plaintiff an adjustment. This procedure made plaintiff's pain worse. When plaintiff mentioned this fact, defendant said something to the effect that it takes time to work it out.

The plaintiff saw the doctor on October 10 and again on October 15, 1973. During this later visit, the doctor gave plaintiff a back adjustment in which he pulled on his leg and twisted his hip. As he gave him the adjustment, the plaintiff felt a sharp pain shoot from below his belt down to his foot. This was a new sensation. Plaintiff told the defendant about the pain. The defendant told plaintiff to walk across the floor, and when he did so, he felt a tingling in his toes. The plaintiff related to defendant that the pain was worse and that his foot was tingling. The plaintiff believed that defendant again said something to the effect that it takes time to work things out. The plaintiff stated that he returned home, and about one or two hours later while he was watching television, his right leg and foot went completely dead. When he attempted to walk he discovered he could not pick his foot up. He had to drag it along the floor.

The plaintiff testified that he immediately called the doctor but was able only to talk to his wife who told him that what he was experiencing was sometimes a normal reaction. She gave him an appointment for the next day. When plaintiff kept the appointment he saw Dr. Odum's wife. He returned the following day and saw the doctor. He informed the doctor that his leg and foot were dead. The defendant gave him another adjustment which increased the pain in plaintiff's lower back and right hip and failed to alleviate the numbness of his leg and foot. The defendant's

response to plaintiff's report of the results was that time would work it out.

Plaintiff stated that he saw defendant for the last time on October 22, 1973. Plaintiff's condition was unchanged. His leg was dead and he had to drag his foot. During this visit, defendant gave plaintiff both a back and neck adjustment, after which he told plaintiff he could return to work. The plaintiff responded that he did not know how he could since he could hardly walk. Plaintiff could not recall defendant's response to this.

On October 24, 1973, plaintiff consulted Dr. Michael Murphy, a neurosurgeon, about his condition. Dr. Murphy examined him and ordered his hospitalization. After a myelogram was performed, plaintiff was scheduled for surgery which occurred on November 1, 1973. According to plaintiff, the operation relieved his pain but did not improve the numbness of his leg. He has walked with a spring loaded brace since the operation.

On cross-examination, defendant impeached plaintiff's testimony that he told defendant about his previous back operation with his answer in a deposition that he did not believe he had done so.

Neurosurgeon Dr. Michael Murphy testified for plaintiff. He testified that when he examined plaintiff on October 24, 1973, he found that plaintiff could not raise his right foot, had no sensation along the outside of his right leg and complained of pain when his leg was raised 30° above the horizontal. These findings indicated that there was pressure on a nerve. Based on these findings, Dr. Murphy diagnosed plaintiff's condition as a herniated disc between the fourth and fifth lumbar vertebrae.

Dr. Murphy performed plaintiff's surgery on November 1, 1973. He identified plaintiff's exhibit 4 as the ruptured disc he removed from plaintiff's back and testified that it was the largest ruptured disc he had ever seen in one piece in a patient. He further testified that the entire nucleus pulposus or internal material of the disc was extruded outside the disc adjacent to the nerve root that controls the muscle which allows one to lift his foot. In Dr. Murphy's opinion, the pressure of this material against plaintiff's nerve root caused plaintiff's loss of the ability to move his foot.

Dr. Murphy testified concerning several post-operative examinations he performed on plaintiff. Plaintiff's foot-drop condition (the inability to move his foot) showed no improvement. Dr. Murphy stated that in his opinion this condition is permanent and renders plaintiff industrially unemployable. Based on a hypothetical situation encompassing the facts as related by plaintiff, Dr. Murphy expressed his opinion that the manipulation of October 15 caused the disc's material to extrude. He also stated that if the application of force which caused this massive extrusion of material to occur had not been done, the patient's chance of retaining the function of his foot following surgery would have been greatly increased.

On cross-examination, Dr. Murphy admitted that he had no personal knowledge of chiropractory. He testified that many things can cause a herniated disc, including sneezing, bending, lifting and chiropractic manipulation. He also expressed his opinion that plaintiff had a herniated disc before he saw the defendant.

Plaintiff next presented the expert testimony of Dr. Wilbur Holland, a licensed chiropractor, who had practiced chiropractory in Collinsville, Illinois, since 1956. He testified that he received a doctor of chiropractic degree from the Palmer School of Chiropractic located in Davenport, Iowa, in 1949 and that he received the same degree from Missouri Chiropractic College in St. Louis in 1955. He also did some graduate work at Logan Chiropractic College in St. Louis before the Missouri Chiropractic College merged with it. He indicated that in the past he had been employed by various insurance companies for the purpose of reviewing the practices of chiropractors to determine if they had given standard and customary services.

Dr. Holland stated that he was familiar with the standards which exist in Illinois in the chiropractic profession, reflecting professional knowledge, skill, scientific approach, diagnostic ability and recognition of limitations. After being asked to assume a hypothetical situation consistent with the facts as related by plaintiff and Dr. Murphy, Dr. Holland expressed an opinion based on his familiarity with chiropractic standards in Illinois that the case described was not one for chiropractic services. This opinion was based on the evidence of a motor loss in the patient's leg. The doctor testified that when confronted with a patient with these symptoms a chiropractor should first determine through neurological testing whether there was an actual neurological loss, and once such loss is confirmed he should do nothing or at least request a consulting opinion of one in the field of orthopedics or neurology. The doctor indicated that the chiropractor should do nothing because if there is already pressure on a nerve, any mechanical force, no matter how well intended, has the potential to cause further damage to the disc and permanent damage to the nerve sections involved. Dr. Holland also expressed the opinion that the massive extruded disc removed from plaintiff was sufficient to cause the radiating pain which he felt during the October 15 adjustment, the immediate tingling sensation in his foot and the subsequent foot drop. He also stated that all chiropractors are taught and should know about the possible ill effects a spinal adjustment may have upon a ruptured disc and a nearby nerve root.

On cross-examination, Dr. Holland stated that if one were to define southern Illinois as the area south of U.S. Route 50, he had not had occasion to observe any chiropractor practice his profession in southern Illinois. He indicated further that although he had discussed treatment with

chiropractors in that area, he had not had occasion to observe or discuss the practice of chiropractory in Union County, Illinois.

On redirect examination, Dr. Holland stated that the literature available to chiropractors contains references to cases in which chiropractic manipulation has caused a ruptured disc. He also indicated that it is fairly common knowledge among chiropractors that the annular ring in a 38-year-old man who has had a prior disc injury is fragile and that chiropractic manipulation could cause the extrusion of a disc's internal material.

The plaintiff next called Dr. Odum under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 60). He testified that he had been engaged in chiropractory since 1948 and had degrees from both the Palmer School of Chiropractic and Logan Chiropractic College. Dr. Odum stated that his file on the plaintiff contains no record of what plaintiff related to him during his October 8 interview, including the pain he was experiencing. In addition, defendant had no personal recollection of what plaintiff told him. He agreed, however, that a letter of June 6, 1974, which he wrote to plaintiff's counsel recited that difficulty of movement was one of the symptoms which plaintiff related to defendant's wife on his first visit of October 5, 1973. Plaintiff's file also contained no record whether plaintiff displayed any signs of neurological deficit. Although Dr. Odum remembered conducting a straight leg lift and another neurological test on plaintiff, the only record of any objective neurological findings in plaintiff's file was a graph recording the heat on the back of plaintiff's neck at certain points. Dr. Odum testified that he did not see a scar on plaintiff's back during his treatment of him.

The defendant testified further that he arrived at a diagnosis of a possible ruptured disc. He believed that it was possible that a portion of plaintiff's disc was outside its capsule. Defendant knew that if this was so, the disc was subject to greater extrusion. He also knew that chiropractic manipulation can cause more extrusion of the disc material, but despite this risk, he decided to give plaintiff an adjustment. He testified that he also knew of the possibility of the entire nucleus pulposus extruding into the spinal canal and pressing against a nerve root. The first adjustment he gave plaintiff manipulated his spine in a manner which affected all of it. Defendant stated that on October 15, 1973, he gave the plaintiff another spinal manipulation which influenced plaintiff's whole hip to move. He had no recollection of plaintiff's making a complaint about a radiating pain or a tingling sensation at that time. He also stated that he never noticed the plaintiff dragging his foot or walking in an abnormal manner during any of his treatment visits.

Defendant called as his only witness Dr. Harold Halterman, a chiropractor whose practice was located in the same town as defendant's, Anna, Illinois. Dr. Halterman, who received his chiropractic degree from Missouri Chiropractic College, testified that he was familiar with the

practice of chiropractory in southern Illinois. He stated that at times he has utilized a manipulation type procedure on patients who had or were suspected to have a herniated disc but that treatment depended on the symptoms. He considered manipulation to be a proper treatment in the right case. In response to a hypothetical question which assumed the circumstances surrounding plaintiff's chiropractic care to have been as recalled by defendant, Dr. Halterman expressed the opinions that the chiropractor's treatment neither caused a herniation of a disc or aggravated a preexisting herniation.

On cross-examination, Dr. Halterman testified that if the thrust in a lumbar roll manipulation is done with sufficient force it could cause a herniation or an aggravation of a herniated disc. He testified further that a radiating pain down one's leg, a tingling sensation in the foot and a foot-drop condition are all signs of great pressure on a nerve root and are symptoms which indicate that the adjustment preceding them could have aggravated a herniated disc or caused a herniation. Dr. Halterman went one step further and stated that if the radiating pain immediately followed a thrust in a lumbar roll manipulation, the only conclusion possible is that the thrust caused the symptom. He also stated that the best treatment for a patient who is experiencing pain in his lower back and hip and difficulty in moving his leg is rest and traction.

■ One element of a cause of action for medical malpractice is proof of the standard of care by which the defendant physician's conduct is to be measured. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279; *Anderson v. Martzke* (1970), 131 Ill. App. 2d 61, 266 N.E.2d 137.) The plaintiff in a medical malpractice action generally must establish the standard of care through expert testimony. The plaintiff must then prove by affirmative evidence that, judged in light of these standards, the doctor was unskillful or negligent and that his want of skill or care caused the injury to the plaintiff. (*Walski v. Tiesenga*; *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301.) Defendant's final contention here is that the plaintiff failed to establish the appropriate standard of care against which to measure his chiropractic treatment of plaintiff. We disagree.

Defendant presents three arguments in support of his contention. He first claims that the evidence as to a standard of care was insufficient because the testimony of defendant's expert Dr. Holland was based on what he would have done given the hypothetical facts rather than what is generally recognized as appropriate in the profession. In support of this assertion, defendant directs our attention to Dr. Holland's use of the personal pronoun in the following exchange.

"[Plaintiff's counsel]: * * * Assuming all those facts, doctor, to be true, I would like to know whether or not you have an opinion as to

whether or not the chiropractor in the hypothetical question met those professional standards which you have described.

\* \* \*

A. Well, I have questioned the standards of care more fully than that in this situation.

Q. In what respects, doctor?

A. Well, to begin with, the cases (sic) which you have described leads *me* to believe that there was a motor loss in that leg before he came to the chiropractor's office. If indeed there was the presence of a motor loss then *I* don't believe that case would have been one for chiropractic services." (Emphasis added.)

Although it is undoubtedly true that the standard of care may not be established merely by presenting testimony of another doctor that he would have acted differently than the defendant (*Walski v. Tiesenga; Stevenson v. Nauton* (1979), 71 Ill. App. 3d 831, 390 N.E.2d 53), we cannot agree with defendant that this is such a situation. It is our opinion that the use of the personal pronoun by Dr. Holland merely demonstrated that it was his opinion that chiropractors in general would have recognized and considered this case as one which is not susceptible to chiropractic treatment because of the patient's difficulty in moving his leg. Moreover, even if we were to assume that defendant's interpretation of this specific answer is correct, we would not be required to reverse the instant judgment, because Dr. Holland's testimony adequately established the standard of care in portions other than that which defendant has challenged in this appeal.

Defendant next asserts that Dr. Holland's testimony must be deemed to have been inadequate to establish the relevant standard of care because he failed to specifically inform the jury at the outset of his opinion testimony what general standards he was familiar with in the chiropractic profession in Illinois. This assertion misconceives the function of the expert witness in establishing a professional standard of care. All that is necessary for the expert to establish is that there was a generally accepted medical standard of care or skill which entailed treatment or performance of a procedure in a manner different than that provided by the defendant. In the present case, a fair reading of Dr. Holland's testimony is that it indicated that there was a generally accepted chiropractic standard of care when confronted with a patient with the plaintiff's symptoms to recognize that such a condition was not one for chiropractic manipulation but rather, one requiring a recommendation of rest or a referral to a neurosurgeon or orthopedic surgeon. Defendant's own expert apparently agreed with this position as well, since he indicated that the best treatment for a patient with plaintiff's symptoms was rest and traction.

Defendant points to the testimony of plaintiff's neurosurgeon witness,

Dr. Murphy, and asserts that at no time did he describe the standard of care to be used by a chiropractor in treating a patient such as plaintiff. Because of its recent filing defendant did not cite, but we are aware of the supreme court case of *Dolan v. Galluzzo* (1979), 77 Ill. 2d 279, 396 N.E.2d 13, which held that a podiatric practitioner should be judged by the standards of care of his expressly recognized school. The case does not announce a new or different rule. *Dolan*, however, does not require reversal here, for it is apparent from an examination of the testimony of Dr. Murphy that he was describing plaintiff's injury and condition from the neurological standpoint as he found that injury and condition to be. He did not purport to criticize defendant's treatment or to characterize his conduct in treating plaintiff as something less than that to be expected of a licensed chiropractor.

Defendant's final argument is that even if plaintiff's evidence established the standard of care applied by chiropractors generally in the treatment of a condition such as plaintiff's, he did not establish the appropriate standard since it was not that of the rural Anna-Jonesboro area where defendant practiced. He emphasizes the fact that plaintiff's expert, Dr. Holland, practiced chiropractory in Collinsville, Illinois, a part of the greater St. Louis metropolitan area, and testified based on a familiarity with the standards of chiropractors in the State as a whole rather than in a rural area like Anna-Jonesboro.

■■ Although Illinois follows the "locality rule" under which a defendant doctor is bound to exercise such care and diligence as a good practitioner in a same or similar community would, the term "locality" has no precise meaning and varies with the facts of each particular case. (*Stogsdill v. Manor Convalescent Home, Inc.* (1976), 35 Ill. App. 3d 634, 343 N.E.2d 589.) The locality which applies to a defendant should not be narrowed any further than is necessary to promote the rationale for the rule. As the court noted in *Stogsdill*, the rationale for the locality rule is the "difference between the opportunities for continued medical education available to a rural physician and those available to an urban one." 35 Ill. App. 3d 634, 653, 343 N.E.2d 589, 604.

■■ In the present case it is apparent that the rationale for the rule does not require us to presume that chiropractors practicing in Anna, Illinois, operate under a different standard of care in a case such as this than do chiropractors generally in the State of Illinois. First, we note that the knowledge which was relevant to the instant problem was not something which could only have been learned through continuing education as to recent developments. Rather, the knowledge upon which the present standard was based was something which has always been taught in chiropractic schools and is of common knowledge in the profession. In fact, the testimony of defendant indicated that his diagnosis of the plaintiff's condition was consistent with the other experts' and that he was aware of the risks of nerve damage which are

present in the manipulation of the spine of one who has a ruptured disc. Moreover, we note that the educational history of both the defendant and Dr. Holland, the plaintiff's witness who testified as to the standard of care, are quite similar. They both received their first chiropractic degrees from the same college at approximately the same time and also received second degrees from separate chiropractic colleges both of which were located in St. Louis, Missouri. Under these facts, we find that plaintiff adequately established the standard of care against which to measure defendant's conduct.

For the foregoing reasons, we affirm the judgment of the circuit court of Union County.

Affirmed.

KARNS and KASSERMAN, JJ., concur.