**Michael CHAMBERS,**
**Plaintiff–Appellee–Cross–Appellant,**

v.

**Victoria INGRAM,**
**Defendant–Appellant–Cross–Appellee.**

**Nos. 87–1555, 87–1606 and 87–1873.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 18, 1988.

Decided Sept. 21, 1988.

William D. Frazier, Asst. Atty. Gen., Chicago, Ill., for plaintiff-appellee-cross-appellant.

Joel T. Pelz, Jenner & Block, Chicago, Ill., for defendant-appellant-cross-appellee.

Before WOOD Jr., CUDAHY, and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

The plaintiff, Michael Chambers, was an inmate at Joliet Correctional Center (Joliet) from March 1983 until May 1984. During that time, Mr. Chambers was placed in the psychiatric unit and allegedly forced to ingest, against his will, Haldol—a psychotropic drug. He brought this civil rights action under 42 U.S.C. § 1983 against Dr. Victoria Ingram, the supervising psychologist at Joliet, as well as several other state officials. His suit also alleged a pendent state law claim for medical malpractice. Dr. Ingram appeals from the jury verdict against her on the medical malpractice claim. She also appeals from the district court's order overruling objections to Mr. Chambers' bill of costs. Mr. Chambers cross-appeals from the district court's grant of a directed verdict on his section 1983 claim. We affirm the judgment of the district court on the merits and remand for further consideration of the matter of costs.

I

Background

A. *Facts*

The testimony at trial, as well as information contained in Mr. Chambers' medical records, revealed the following facts. In November 1983, while an inmate at Joliet, Mr. Chambers was threatened by several gang members. Afraid for his life, he requested that he be moved into protective custody. However, because there were no cells available in the protective custody unit at that time, he instead was placed temporarily in an open cell at the end of the segregation unit. Still fearful that the

gang members would harm him, Mr. Chambers took the advice of a fellow inmate that he should pretend to be crazy so that he would be transferred to the psychiatric unit. Accordingly, he scratched his wrist with a plastic kitchen knife and asked a guard whether he would contract gangrene if he poured ink into the wound, and, if so, whether the gangrene would kill him.

Mr. Chambers was brought to the psychiatric unit on November 30, 1983 by a correctional officer. The officer said that Mr. Chambers had tried to commit suicide by hanging himself with a noose.[1] Upon arrival, he was interviewed by the defendant Dr. Ingram. Dr. Ingram was the supervising psychologist in charge of Joliet's psychiatric unit. As a psychologist, she cannot prescribe drugs. Dr. Ingram testified that Mr. Chambers did not appear to be violent at this first meeting. She also testified that Mr. Chambers told her that he was afraid of the gangs. Dr. Ingram recorded her observations in Mr. Chambers' medical records. She noted that he appeared "very agitated" and "very anxious," and was "rocking back and forth in his chair." Additionally, she diagnosed Mr. Chambers as suffering from an "acute anxious state," and concluded that he was "depressed and a danger to himself." As a result of this initial examination, Dr. Ingram placed Mr. Chambers on suicide watch.

After examining Mr. Chambers, Dr. Ingram talked briefly over the telephone with Dr. Syed Ali. Dr. Ali is a psychiatrist who contracted with the Illinois Department of Corrections to provide his services at Joliet for approximately twenty hours per week. Dr. Ingram informed Dr. Ali of Mr. Chambers' condition, whereupon Dr. Ali prescribed Sinequan and Atarax. Sinequan is a drug primarily used for severe depression, and Atarax is a mild tranquilizer used to reduce anxiety. Dr. Ali had not seen Mr. Chambers at the time he prescribed these drugs.

On December 1, 1983, Dr. Ingram again met with Mr. Chambers. The medical records for this day reflect Dr. Ingram's observations that Mr. Chambers did not exhibit any "suicidal ideations" or "paranoid ideations." She believed that Mr. Chambers' condition had improved and noted Mr. Chambers' statement that he did not want to hurt himself. Dr. Ingram did not talk to Dr. Ali about Mr. Chambers' condition on this day.

The first personal contact Dr. Ali had with Mr. Chambers was on December 2, 1983, at which time Dr. Ali conducted a fifteen-minute examination. Two days then went by during which Mr. Chambers did not see either Dr. Ali or Dr. Ingram. Dr. Ingram next met with Mr. Chambers on December 5, 1983, at which time she observed that Mr. Chambers was "less anxious" but was "thinking of harming himself if he was off the unit." Dr. Ingram followed up this meeting with a phone call to Dr. Ali. After discussing Mr. Chambers' condition with Dr. Ingram, Dr. Ali prescribed two additional drugs for Mr. Chambers, Haldol and Artane. Haldol is a psychotropic drug primarily used to treat individuals who are schizophrenic or psychotic on a long-term basis. It has a number of well-known serious side effects, including seizures. Artane is a drug that is used to alleviate some of Haldol's minor side effects, but does not control the more serious ones such as seizures. Dr. Ali testified that he relied on information provided by Dr. Ingram in prescribing this medication and that the purpose of the medication was to prevent Mr. Chambers from committing suicide.

The Haldol was administered to Mr. Chambers by a nurse. Mr. Chambers asked the nurse what he was being given. Upon being informed that it was Haldol, Mr. Chambers refused to take the medication. He testified that his reason for refusing the medication was that he had

---

1. Mr. Chambers testified at trial that he does not remember ever having tried to commit suicide. The record does not contain an account of the alleged suicide incident because the correctional officer who reported it was not available to testify at trial. In any case, whether or not Mr. Chambers in fact attempted to commit suicide, the parties agree that his medical records indicated that he had done so.

heard from other inmates that Haldol can cause seizures. The nurse informed Mr. Chambers that if he persisted in his refusal, she would call the security guards to hold him down so that the medication could be injected intramuscularly. Mr. Chambers testified that he finally agreed to take the Haldol because he had seen other inmates being forcibly injected and he believed the nurse would carry out her threat to do the same with him.

Dr. Ali conducted a second fifteen-minute session with Mr. Chambers on December 6, 1983. Dr. Ingram met with Mr. Chambers on the next day. She concluded at this time that Mr. Chambers was doing much better and could be released from the psychiatric unit in the near future. However, she did not immediately notify Dr. Ali of her observations. On December 8, 1983, Mr. Chambers suffered two seizures—one in the morning and one in the afternoon. On December 9, 1983, he was taken to the hospital where tests confirmed that he had suffered two grand mal seizures. Mr. Chambers was discharged from the psychiatric unit on December 10, 1983. He alleges that he has since experienced several additional seizures, severe headaches, blackouts, and dizzy spells.

### B. *Procedural History*

In his third amended complaint, Mr. Chambers named six individuals as defendants, including Dr. Ingram, Dr. Ali, and various state officials.[2] Only Dr. Ingram and Dr. Ali were named in the pendent state malpractice suit. Dr. Ali was dismissed as a defendant before trial pursuant to a settlement agreement. The trial began on March 9, 1987. At the close of Mr. Chambers' case-in-chief, the district court granted the defendants' motion for a di-

rected verdict on the civil rights claim.[3] However, the court denied Dr. Ingram's motion for a directed verdict on the medical malpractice claim. At the close of the evidence, Dr. Ingram renewed her motion for a directed verdict, which the court also denied.

Following an eight-day trial, the jury returned a verdict in favor of Mr. Chambers and against Dr. Ingram on the medical malpractice claim and assessed damages at $17,000. Dr. Ingram filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. This motion was denied by the district court in an order dated March 30, 1987. On April 17, 1987, the district court granted the plaintiff's bill of costs in the amount of $4,785.54. This amount included $3,000 in fees for the plaintiff's expert witness, Dr. Schwarz. Dr. Ingram filed a motion to reconsider the entry of the plaintiff's bill of costs. The district court denied this motion on April 30, 1987.

### C. *Opinion of the District Court*

The district court's ruling on Dr. Ingram's motion for a directed verdict with respect to Mr. Chambers' medical malpractice claim was rendered orally from the bench. In denying Dr. Ingram's motion, the court also narrowed the range of issues that it would allow to remain in the case to a single theory of medical malpractice. That theory, according to the court, was that

> there was an inadequate, improper—or improper information given by Dr. Ingram to Dr. Ali, and that information given by Dr. Ingram to Dr. Ali deviated from the standard of care that is required by the law.

2. The state officials named in the plaintiff's third amended complaint included: Michael Lane, the director of the Illinois Department of Corrections; J.W. Fairman, the warden at Joliet; Paul O'Flynn, the health care administrator at Joliet; and Ronald Shansky, the agency medical director for the Illinois Department of Corrections.

3. Mr. Chambers previously had agreed to a voluntary dismissal of the defendants Mr. Lane and Mr. Fairman. *See supra* note 2. The dis-

trict court then granted a directed verdict in favor of the remaining defendants. However, Mr. Chambers has appealed only from the district court's grant of a directed verdict in favor of Dr. Ingram. *See* R. 134 (Plaintiff's Notice of Appeal); *cf. Torres v. Oakland Scavenger Co.*, —— U.S. ——, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988) (failure to specify in notice of appeal the party or parties taking the appeal presents a jurisdictional bar to the appeal).

Based in part on this inaccurate or improper information, the jury could find that Dr. Ali gave the plaintiff Haldol when it was not medically indicated, and that this was the cause of the plaintiff's seizures.

Clearly, in my view the record shows that Dr. Ali himself had committed the malpractice; that's not before me. That portion of the case has been settled.

Dr. Ingram's liability for medical malpractice is much more tenuous and it's limited only to the circumstance that I have suggested already, *and I will direct out any other theory of malpractice* which I believe the evidence does not show and support.

Tr. at 337–38 (emphasis supplied).

The district court's decision to grant a directed verdict on the section 1983 claim also was given orally from the bench. The court stated that there was no evidence of wilful neglect or deliberate indifference and, therefore, that the malpractice case against Dr. Ingram did not rise to a civil rights claim under either the eighth amendment or the fourteenth amendment. The court stated:

All right. As to the civil rights section—let me start backwards.

Assuming that we have a malpractice case here—and I will speak specifically about malpractice in the context of the malpractice count in a minute—in my view it does not rise to a civil rights liability under either the Eighth or the Fourteenth Amendment.

I don't believe that the actions of any of the remaining defendants in the civil rights count amount to either wilful neglect or deliberate indifference. I don't believe there is evidence to support that.

It's not—a conditions case has not been made. The state officials have not been shown to be aware of prior complaints; they were not personally involved.

The circumstances of the forced ... ingestion of Haldol were not done with deliberate indifference or wilful neglect but, perhaps, were done with gross negligence in misdiagnosing a patient who superficially might have appeared to be a psychotic, suicidal person, but, perhaps, with greater standard of medical evaluation and care would not have been properly diagnosed in that manner.

I think what we simply have here is a medical malpractice case, and for that reason I am going to allow the motion as far as the civil rights count.

*Id.* at 336–37.

## II

### Discussion

#### A. *The Medical Malpractice Claim*

■ We first consider Dr. Ingram's appeal from the jury verdict against her on the medical malpractice claim. Our standard of review is governed by state law. *See Dickerson v. Amax, Inc.*, 739 F.2d 270, 272 (7th Cir.1984). Under Illinois law, a directed verdict or a judgment notwithstanding the verdict may be entered only if the evidence, "when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on the evidence could ever stand." *Pedrick v. Peoria & E.R.R.*, 37 Ill.2d 494, 229 N.E.2d 504, 513–14 (1967); *see also Borowski v. Von Solbrig*, 60 Ill.2d 418, 328 N.E.2d 301, 305 (1975). In this case, we cannot say that the evidence so overwhelmingly favored Dr. Ingram that the district court erred in denying her motions for a directed verdict and motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial.

To establish a claim of medical malpractice in Illinois the plaintiff must show: (1) the applicable standard of care; (2) that the defendant breached that standard and thus was negligent; and (3) that the breach was a proximate cause of the plaintiff's injury. *See Purtill v. Hess*, 111 Ill.2d 229, 95 Ill. Dec. 305, 310, 489 N.E.2d 867, 872 (1986); *Borowski*, 328 N.E.2d at 304–05. Dr. Ingram argues that Mr. Chambers failed to establish any of these three factors.

First, Dr. Ingram argues that Mr. Chambers failed to present any evidence on the applicable standard of care. Dr. Ingram asserts that, although Mr. Chambers' ex-

pert witness, Dr. Schwarz, testified that she was negligent in reporting her diagnosis of Mr. Chambers' condition to Dr. Ali, Dr. Schwarz failed to establish, as an initial matter, what the proper standard of care was that Dr. Ingram should have met. This contention is unfounded for several reasons. First, the jury was instructed, without any objections, that:

> When treating a patient a psychologist must possess and apply the knowledge and use the skill and care that's ordinarily used by reasonably well-qualified psychologists in the locality in which he practices or in similar localities in similar cases and circumstances.

> Failure to do so is a form of negligence that's called malpractice.

> . . . .

> The defendant owes the plaintiff the same duty of care owed to patients in private practice.

Tr. at 452. This instruction, setting forth the standard of care, was proper under Illinois law. *See Purtill*, 95 Ill.Dec. at 310, 489 N.E.2d at 872 ("In determining the standard of care against which the defendant physician's alleged negligence is judged, Illinois courts have followed the 'similar locality' rule, which requires a physician to possess and to apply that degree of knowledge, skill, and care which a reasonably well-qualified physician in the same or similar community would bring to a similar case under similar circumstances."); *see also* Illinois Pattern Jury Instructions Civil § 105.01 (2d ed. 1971).

Second, Mr. Chambers' expert witness, Dr. Schwarz, testified that he was aware of the proper standard of care for psychologists in November and December of 1983.[4] He further testified that, in his opinion, Dr. Ingram's treatment of Mr. Chambers deviated from the applicable standard of care that existed in the community in November and December of 1983. The district court overruled the defendant's objection to Dr. Schwarz' testimony that there was no prop-

er foundation showing his familiarity with the standard of care. The determination of whether a witness is qualified to testify as an expert lies within the sound discretion of the district court. *United States v. Tomasian*, 784 F.2d 782, 785 (7th Cir.1986); *Baumholser v. Amax Coal*, 630 F.2d 550, 551 (7th Cir.1980); *see also Dolan v. Galluzzo*, 77 Ill.2d 279, 32 Ill.Dec. 900, 903, 396 N.E.2d 13, 16 (1979) ("[I]t lies within the sound discretion of the trial court to determine if the witness is qualified to testify as an expert regarding the standard of care."). Dr. Ingram has not offered any reason why we should overturn the district court's exercise of discretion in this case on this issue.

■ Dr. Ingram's real argument appears to be that, in order to establish the applicable standard of care in a medical malpractice case, the plaintiff must introduce expert testimony about the standard of care that is totally separate from any testimony about deviations from such standard. We disagree. An expert's testimony that a defendant's actions were negligent may be sufficient to establish the existence of a duty as well as the breach of that duty. In *Chamness v. Odum*, 80 Ill.App.3d 98, 35 Ill.Dec. 404, 409, 399 N.E.2d 238, 243 (1979), one of the plaintiff's experts testified that he was familiar with the standards that existed in Illinois in the chiropractic profession. He then expressed an opinion, based on his familiarity with chiropractic standards in Illinois, that the defendant's treatment was negligent. On appeal, the defendant claimed that the evidence as to a standard of care was insufficient. The court rejected this argument, stating:

> Defendant next asserts that [the expert's] testimony must be deemed to have been inadequate to establish the relevant standard of care because he failed to specifically inform the jury at the outset of his opinion testimony what

---

**4.** Generally, a plaintiff in a medical malpractice suit must establish the standard of care through expert testimony. *Walski v. Tiesenga*, 72 Ill.2d 249, 21 Ill.Dec. 201, 204, 381 N.E.2d 279, 282 (1978). "[E]xpert testimony is needed to sup-

port a charge of malpractice because jurors are not skilled in the practice of medicine and would find it difficult without the help of medical evidence to determine any lack of necessary scientific skill on the part of the physician." *Id.*

general standards he was familiar with in the chiropractic profession in Illinois. This assertion misconceives the function of the expert witness in establishing a professional standard of care. All that is necessary for the expert to establish is that there was a generally accepted medical standard of care or skill *which entailed treatment or performance of a procedure in a manner different than that provided by the defendant.* In the present case, a fair reading of [the expert's] testimony is that it indicated that there was a generally accepted chiropractic standard of care when confronted with a patient with the plaintiff's symptoms to recognize that such a condition was not one for chiropractic manipulation but rather, one requiring a recommendation of rest or a referral to a neurosurgeon or orthopedic surgeon.

*Id.* 35 Ill.Dec. at 411–12, 399 N.E.2d at 245–46 (emphasis supplied). Likewise, a fair reading of Dr. Schwarz' testimony is that it indicated that Dr. Ingram deviated from the applicable standard of care with respect to Mr. Chambers' treatment because she failed to obtain information, failed to record information, and failed to apprise Dr. Ali of Mr. Chambers' condition. Read in context, Dr. Schwarz testified that there was a generally accepted standard of care among professionals in the field of psychology to provide accurate information about the patient's mental condition.[5]

Dr. Ingram next argues that Mr. Chambers failed to introduce any evidence of a deviation from the standard of care that would constitute negligence on her part. Dr. Ingram asserts that every instance of negligence cited by Dr. Schwarz on direct examination was shown to be false on cross-examination. Specifically, Dr. Ingram argues that, while Dr. Schwarz testified on direct examination that she failed to report her observations of Mr. Chambers so that Dr. Ali could properly diagnose his condition and prescribe the correct drugs for treatment of that condition, Dr. Schwarz admitted on cross-examination that Dr. Ingram in fact accurately described Mr. Chambers' condition in the medical reports. Consequently, she contends, there was no evidence from which the jury could have found a breach of the standard of care. Dr. Ingram asserts that this is not a question of credibility. Rather, in her view, the issue is whether the jury should have been allowed to rely on Dr. Schwarz' statements on direct examination when those statements were completely contradicted by his testimony on cross-examination.

We disagree with Dr. Ingram's contention that there was no evidence from which the jury could have found that she failed to provide accurate information of Mr. Chambers' condition to Dr. Ali. Dr. Schwarz testified that Dr. Ingram breached the applicable standard of care in that she (1) failed to conduct a thorough mental status examination at the initial interview; (2) failed to make a detailed report of the interview containing impressions and bases for her diagnosis; (3) failed to report all information about suicidal tendencies to Dr. Ali; (4) failed to record all courses of treatment in the daily notes; and (5) failed to recognize when medications were inconsistent with recorded observations and pass this information on to Dr. Ali. Although Dr. Schwarz appeared to concede upon cross-examination that Dr. Ingram's initial

---

5. In *Walski,* 21 Ill.Dec. at 204, 381 N.E.2d at 282, the court held that the plaintiff's expert witness failed to establish the standard of care because he testified only concerning his own personal preference for a different practice than was followed by the defendant doctor. However, at no time did he testify "that there was a generally accepted medical standard of care, or skill which required" that the practice he preferred be followed. *Id.* at 206, 381 N.E.2d at 284; *see also Purtill v. Hess,* 111 Ill.2d 229, 489 N.E.2d 867 (1986); *Bartimus v. Paxton Community Hosp.,* 120 Ill.App.3d 1060, 76 Ill.Dec. 418, 458

N.E.2d 1072 (1983). We note that, in this case, Dr. Schwarz clearly testified that Dr. Ingram's failure to provide certain information violated the relevant standard of care, not just that *his* practice or preference was to provide the additional information. Thus, this is not a case where we are presented "only with testimony of the existence of methods other than those employed by the defendant but no testimony that the method used by the defendant was not considered proper by the medical community." *Walski,* 21 Ill.Dec. at 204, 381 N.E.2d at 282.

report on Mr. Chambers' condition was not, in fact, deficient in several of the areas noted above, not all of his direct examination was impeached. For instance, Dr. Schwarz indicated that Dr. Ingram's contacts with Mr. Chambers were too infrequent to develop adequately the information upon which Dr. Ali based his decision to prescribe Haldol. Moreover, Dr. Schwarz testified that Dr. Ingram failed to apprise Dr. Ali of her later observations that Mr. Chambers' was no longer exhibiting suicidal ideations and that his condition had improved to the point where he could be returned to the general prison population. In addition, Dr. Schwarz testified that the medical reports did not indicate that Mr. Chambers was a psychotic, suicidal patient and therefore, that Dr. Ingram should have known that it was inappropriate to treat him with Haldol. The jury properly could have relied on any of these factors in finding Dr. Ingram negligent.

Finally, Dr. Ingram argues that there was no evidence from which the jury could have found that her alleged deviation from the applicable standard of care was a proximate cause of Mr. Chambers' seizures. She asserts that, because Dr. Ali alone had the power to prescribe medication, his decision to do so constituted an independent superseding cause of Mr. Chambers' injuries thereby relieving her of any liability. We disagree. Although the decision to prescribe Haldol was made by Dr. Ali, the jury properly could have determined that Dr. Ingram contributed to this decision because Dr. Ali relied on her for information regarding Mr. Chambers' condition in making decisions about the proper course of medication. For instance, Dr. Ali testified that:

Q. On the days when you didn't see Mr. Chambers, who were you relying on to give you information about his condition?

A. The staff, namely the nursing staff, Dr. Ingram and also Mr. Chambers.

Q. Doctor, on—it's December 5th when you prescribed two additional drugs, correct?

A. Yes.

Q. And that's Halperidol, or Haldol, and Artane, is that correct?

A. That's correct.

Q. Did you talk with anyone that day about those prescriptions?

A. Yes.

Q. Who did you talk to?

A. I spoke to the nurse when I ordered the medication.

Q. Did you talk to Dr. Ingram before you ordered the medications?

A. Yes.

Q. And did you discuss with Dr. Ingram what the course of treatment should be and what type of medication should be given?

A. Yes.

Q. Do you recall, did Dr. Ingram tell you in that conversation that she had found that Mr. Chambers was exhibiting no suicidal ideations?

A. I think she mentioned on the contrary, that he admitted to hurting himself.

Q. So it was your understanding from her, that he was showing suicidal ideations?

A. Correct.

Tr. at 107–09. Dr. Ali prescribed medication for Mr. Chambers on two occasions, both of which were immediately after he consulted with Dr. Ingram. Further, Dr. Ali testified that he had to rely on Dr. Ingram for information about a patient's condition, including changes in that condition after a course of medication had been started. Dr. Ingram conceded that Dr. Ali relied on her for this purpose. The jury therefore could have found that Dr. Ingram's negligence in providing adequate information resulted in Mr. Chambers' being treated with Haldol when Haldol was not medically indicated. It is undisputed that the Haldol caused Mr. Chambers' seizures.

In sum, we reject Dr. Ingram's contention that the district court should have entered judgment in her favor as a matter of law because there was insufficient evidence to support the verdict in favor of Mr. Chambers. The questions of whether Dr. Ingram deviated from an applicable standard of care and whether her conduct was a proximate cause of Mr. Chambers' inju-

ries are questions of fact for the jury. Our only task is to determine whether the record contains sufficient evidence to support the jury's verdict. We hold that there was. "[W]here there was positive expert testimony concerning the applicable standard of care even though the opinions were weakened on cross-examination and were contradicted by defendant's experts," a directed verdict is inappropriate. *Walski v. Tiesenga*, 72 Ill.2d 249, 21 Ill.Dec. 201, 206, 381 N.E.2d 279, 284 (1978); *see also Borowski*, 328 N.E.2d at 305 ("The opinions of the plaintiff's experts were to a degree weakened on cross-examination and were contradicted by the defendants' witnesses; however, the weight to be given to their testimony was to be determined by the jury."). There was testimony at trial that Dr. Ingram's failure to provide Dr. Ali with accurate information relating to Mr. Chambers' mental condition resulted in a misdiagnosis and that the misdiagnosis, in turn, resulted in Mr. Chambers being treated with a more severe drug than was medically warranted by the situation. This testimony was sufficient to establish a medical malpractice cause of action.

## B. *The Civil Rights Claim*

We next consider Mr. Chambers' contention that the district court erred in directing a verdict against him on the civil rights claim. Our standard of review is controlled by federal law. Under the federal standard, a directed verdict motion "should be denied where the evidence, along with inferences to be reasonably drawn therefrom, when viewed in the light most favorable to the party opposing such motion, is such that reasonable [people] in a fair and impartial exercise of their judgment may reach different conclusions." *Hohmann v. Packard Instrument Co.*, 471 F.2d 815, 819 (7th Cir.1973). In directing a verdict on the section 1983 claim, the district court held that Mr. Chambers had failed to present a claim that Dr. Ingram's conduct deprived him of his constitutional rights under either the eighth amendment or the fourteenth amendment. On appeal, Mr. Chambers only challenges the district court's ruling with respect to the four-

teenth amendment theory of liability. *See* Cross–Appellant's Br. at 32 n. 13. Mr. Chambers' theory under that amendment is that the forced ingestion of psychotropic drugs violates the due process clause.

Several courts have held that forcing a person to ingest psychotropic drugs, under some circumstances, may violate that person's constitutional rights under the due process clause of the fourteenth amendment. *See United States v. Charters*, 829 F.2d 479 (4th Cir.1987); *Bee v. Greaves*, 744 F.2d 1387 (10th Cir.1984), *cert. denied*, 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985); *Osgood v. District of Columbia*, 567 F.Supp. 1026 (D.D.C.1983); *Davis v. Hubbard*, 506 F.Supp. 915 (N.D.Ohio 1980); *cf. Lojuk v. Quandt*, 706 F.2d 1456, 1464–69 (7th Cir.1983), *cert. denied*, 474 U.S. 1067, 106 S.Ct. 822, 88 L.Ed.2d 795 (1986) (right to refuse electroconvulsive therapy). In *Lojuk*, this court set forth several of the rationales that courts have relied on in recognizing a liberty interest to refuse treatment with psychotropic drugs:

Other courts that have confronted the issue of compulsory treatment have identified three interests that are implicated. First, several courts have found that compulsory treatment with mind-altering drugs may invade a patient's First Amendment interests in being able to think and communicate freely. Second, compulsory treatment with antipsychotic drugs may invade a patient's interest in bodily integrity, personal security and personal dignity. Finally, compulsory treatment may invade a patient's interest in making certain kinds of personal decisions with potentially significant consequences.

*Lojuk*, 706 F.2d at 1465 (citations omitted).

However, as both parties acknowledge, these authorities also provide for an "emergency exception" to this right when the patient is an immediate threat to his own life or the safety of others. *See, e.g., Charters*, 829 F.2d at 484 ("[T]he present case does not present an emergency situation in which violence or the imminent deterioration of a patient will occur in the absence of forcible medication...."); *Bee*,

744 F.2d at 1395 ("Bee does not dispute that forcible medication with antipsychotic drugs may be required in an emergency."); *Osgood*, 567 F.Supp. at 1030 ("[T]he constitutional rights [the plaintiff] asserts were violated by the forcible administration of Haldol are not absolute, and must give way at least where such action is mandated by a compelling state interest: in this case the need to protect the safety of others."); *Davis*, 506 F.Supp. at 935 ("[T]he State must have at least probable cause to believe that the patient is *presently* violent or self-destructive, and in such condition presents a present danger to himself, other patients or the institution's staff....") (emphasis in original).

■ In this case, the administration of the psychotropic drugs was based on this medical emergency exception. Dr. Ali prescribed the drugs for Mr. Chambers because of his reported suicidal tendencies. In the district court's view, there was sufficient evidence to justify a conclusion that Dr. Ingram was negligent in her reporting of Mr. Chambers' condition to Dr. Ali. Therefore, the invocation of the medical emergency was based on professional negligence. However, the district court also determined that the record did not support a finding that Dr. Ingram's reporting was "done with deliberate indifference or willful neglect...." Tr. at 337. Therefore, the invocation of the medical emergency was not based, in the district court's view, on indifference or neglect of that magnitude.

We believe that, while the record will support a finding of negligence with respect to Dr. Ingram's reporting, it will not support a finding that her conduct amounted to gross negligence or recklessness. Therefore, while continued reliance on the "emergency exception" may have been based on negligence, it was not based on the sort of conduct that will support a violation of the due process clause. *See Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).[6]

### C. *The Objection to the Plaintiff's Costs*

Dr. Ingram also appeals from the district court's order overruling her objections to the plaintiff's bill of costs. Specifically, Dr. Ingram objects to the district court's taxing of expert witness fees in the amount of $3,000. Mr. Chambers concedes that he cannot obtain reimbursement for expert witness fees under Federal Rule of Civil Procedure 54(d) pursuant to which a prevailing party may recover his costs. *See Crawford Fitting Co. v. J.T. Gibbons, Inc.*, — U.S. ——, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987) (a prevailing party seeking reimbursement for fees paid to its own expert witness may not use Fed.R.Civ.P. 54(d) to exceed the $30–per–day witness fee limit of 28 U.S.C. § 1821); *see also Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 801 F.2d 908 (7th Cir.1986) (where there is no statute authorizing the award of attorneys' fees to the prevailing party, the plaintiff may not receive costs under Rule 54(d) for expert witness fees). Nevertheless, Mr. Chambers asserts that at least a portion of the $3,000 awarded by the district court was appropriate under Federal Rule of Civil Procedure 26(b)(4)(C). Rule 26(b)(4)(C) provides that "[u]nless manifest injustice would result, (i) the court *shall* require that the party seeking discovery pay the expert a reasonable fee for time spent in responding to discovery...." Fed.R.Civ.P. 26(b)(4)(C) (emphasis supplied). Mr. Chambers submits that Dr. Schwarz spent two days testifying at a deposition. Mr. Chambers therefore requests that we affirm the allowance of $1,500 as a reasonable fee for this time. In response, Dr. Ingram contends that Mr. Chambers may not now argue that he is entitled to costs under Rule 26(b)(4)(C) when, at the time Dr. Schwarz' deposition was taken, he never requested such costs or objected when the district court failed to order such costs.

■ The advisory committee notes to Rule 26(b)(4)(C) state that the court may issue an order to pay fees as a condition to discovery "or it may delay the order until after discovery." Fed.R.Civ.P. 26(b)(4)(C)

---

**6.** Because we hold that the district court did not err in directing a verdict against the plaintiff on his civil rights claim, we need not address any of the affirmative defenses raised in the defendant's brief.

advisory committee's note; *see also Nichols v. Laymon,* 506 F.Supp. 267, 274 (N.D. Ill.1980); 8 Wright and Miller, *Federal Practice & Procedure* § 2034 (1970 & Supp.1987). Accordingly, we do not believe that the timing of the plaintiff's request for this discovery cost is a bar to recovery under the rule. However, at the time Dr. Schwarz' deposition was taken, Dr. Ali was still a defendant in this case. Accordingly, in considering Mr. Chambers' request for costs under Rule 26(b)(4)(C), the district court should consider not only whether $1,500 is an appropriate amount but also whether the entire cost should be borne solely by Dr. Ingram.

### Conclusion

We affirm the judgment of the district court on the merits. We vacate the order of the district court overruling the defendant's objections to the plaintiff's bill of costs, and remand for further proceedings. The parties shall bear their own costs.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.