ALBERT J. SULLIVAN, Plaintiff-Appellant, v. RALPH W. HAY, Defendant-Appellee.

Fifth District   No. 5—85—0165

Opinion filed January 17, 1986.

James T. Greve, of Guardianship & Advocacy Commission, of Alton, for appellant.

Randall J. Rodewold, State's Attorney, of Chester (Kenneth R. Boyle, Stephen E. Norris, and Anne C. Fohne, all of State's Attorneys Appellate Service Commission, of counsel), for appellee.

JUSTICE WELCH delivered the opinion of the court:

Following a jury trial in the circuit court of Randolph County, the respondent, Albert Sullivan, was involuntarily committed to the Department of Mental Health and Developmental Disabilities on February 21, 1985. He appeals that commitment arguing that the State failed to clearly and convincingly prove either of the following statutory bases for involuntary commitment: (1) that he was mentally ill and could reasonably be expected to inflict serious harm upon himself or others in the near future or (2) that he was mentally ill and could not provide for his basic physical needs. Ill. Rev. Stat. 1983, ch. 91½, pars. 1—119, 3—808.

Respondent's first contention is that he was not proved mentally ill insofar as his commitment allegedly was not based upon a fresh evaluation of his conduct, but rather, was based upon prior hospitalizations and commitment proceedings. (*People v. Bradley* (1974), 22 Ill. App. 3d 1076, 318 N.E.2d 267.) This allegation is premised on the fact that Dr. James Moore, the clinical psychologist who testified for the State, had not personally examined respondent prior to the hearing. Dr. Moore, who was the State's sole witness, did testify, however, that he was the director of the maximum security unit at the Chester Mental Health Center (CMHC) during the six-month period of respondent's institutionalization immediately prior to those proceedings, and was "well familiar" with respondent's case. Dr. Moore's analysis, therefore, reflected his evaluation of respondent during that six-month period immediately prior to the instant proceedings. Dr. Moore stated that respondent had refused to talk to him regarding the hearing, but that the doctor was familiar with respondent's case through conferences with respondent's therapist and psychiatrist and by reference to the respondent's clinical record.

According to Dr. Moore, respondent was diagnosed as having a schizo affective disorder combined with adult antisocial behavior. Dr. Moore testified that the most recent entry in the clinical record, dated less than one month prior to the commitment proceedings, revealed respondent's diagnosis to be unchanged, and that respondent, age 39, experienced pressure of speech (tendency to speak louder and longer) and feelings of persecution (said that his stay at CMHC was motivated by revenge for his attack on a psychiatrist; said that he is a political prisoner). Dr. Moore testified that the January 30, 1985, clinical

note also revealed that respondent claimed to be an ordained minister, that he planned to build his own church once he left CMHC, that he could work as a legal assistant, and that he had "all sorts of women in different states." Most importantly, Dr. Moore noted that the January 30 note indicated that respondent had a slight deterioration in his mental status. Additionally, he said that most, if not all, of the progress notes showed no clinical changes in respondent's mental status.

The instant case is inapposite to *People v. Bradley* (1974), 22 Ill. App. 3d 1076, 318 N.E.2d 267, cited by respondent for his contention that the evaluation here was not recent enough to support his involuntary commitment. In *Bradley*, the court observed that the only evidence of mental illness was Bradley's prior hospitalization. In the instant case, while respondent's past and current hospitalizations were certainly considered, and properly so, those matters did not constitute the only evidence adduced at trial regarding respondent's mental status. Dr. Moore testified as to a clinical record made less than one month prior to the hearing. Other evaluations appearing in the record, dated December 5, 1984, December 11, 1984, and December 12, 1984, only two months prior to the hearing, contain additional evidence of respondent's mental illness and other mental health professionals' diagnoses of same.

One of those evaluations, the psychiatric evaluation of respondent by Dr. Calabio, dated December 12, 1984, discloses respondent's history and discusses his current status. That evaluation reveals that respondent had been admitted to CMHC on a transfer from the Menard Psychiatric Center where he began serving a prison term in 1968 on charges of armed robbery and rape. Most of respondent's time at Menard had been spent in the psychiatric unit, according to Dr. Calabio, "because of his psychotic and very violent behavior." He had attacked prison staff and a psychiatrist. Also according to the evaluation, respondent had a history of poor compliance in taking his psychotropic medication and so had to be given his medication by injection. Additionally, Dr. Calabio noted that on August 4, 1984, approximately six months prior to the instant proceedings, respondent's treatment psychiatrist at Menard had believed that respondent was not ready for placement in the community because of the likelihood of relapse if he failed to take his medication. Dr. Calabio also revealed that during respondent's admission to CMHC, he had been "hostile, agitated and violent" and had tried to attack the therapy aides without provocation, resulting in his being placed in seclusion and restraints for about seven days. Dr. Calabio further stated in his evalua-

tion that during his interview with the respondent, respondent reiterated that he had served a prison term for crimes he did not commit and that Chester officials "violated his Habeas Corpus." Dr. Calabio further stated that respondent was preoccupied with legal matters and that his thinking was contaminated with paranoid ideas. Significantly, Dr. Calabio reported that respondent believed that his being a minister had changed his life, and that he did not, therefore, have to take any psychotropic medication. Dr. Calabia inferred from this that respondent might not continue his medication upon discharge, causing his mental deterioration and thus making him dangerous to himself and others. Dr. Calabio recommended respondent's continued hospitalization "for further treatment of mental illness." This evaluation was made approximately two months prior to the instant proceedings.

While Dr. Moore said that he believed respondent's past spoke more loudly than the present, that statement does not negate Dr. Moore's consideration of the more recent evaluations. It is true that respondent had exhibited more violent and aggressive behavior in the past than he had immediately prior to the hearing. Nonetheless he was still diagnosed as mentally ill and, as recently as one month prior to the hearing, had experienced a slight decrease in mental status according to the clinical notes. Dr. Moore and Dr. Calabio both stated an important aspect of respondent's illness to be his lack of insight, or acknowledgement, of the existence of his illness. It was believed by both doctors that this lack of insight could cause respondent to stop taking his medication with resulting mental impairment. While at the time of the proceedings respondent's violent and aggressive behavior had been controlled by medication for a period of about six months, this does not of itself demonstrate the absence of mental illness, especially in view of Dr. Moore's testimony that respondent's thinking has not changed and that he is still mentally ill. We must conclude then that the evaluation of respondent was sufficiently fresh and that the jury's finding of mental illness finds ample support in the record.

■ Once it has been determined that respondent was mentally ill, in order for involuntary commitment to be proper, respondent must also be found either: (1) unable to care for himself as a result of that mental illness or (2) to present a reasonable expectation that he would inflict serious harm on himself or others in the near future if he were to be released. The first question was answered by Dr. Moore, who testified that respondent would be able to provide for his daily needs. We turn then to the second question, the likelihood that respondent would inflict serious harm on himself or others if released.

■ According to Dr. Moore, two factors must be considered when

determining a patient's danger to himself or others. The first factor, the presence or absence of violent episodes, militates against involuntary commitment here since respondent had experienced no violent episodes during the six months immediately prior to the instant proceedings. The second factor, however, that of clinical evidence of a change in a patient's thought processes, does not appear to resolve itself in favor of the discharge of the respondent. Dr. Moore explained that many people are able to control or inhibit their violent impulses in certain situations and that, in some situations, the opportunity for violence simply did not present itself. The primary issue, he said, was whether the patient had changed his thought processes. In the instant case, Dr. Moore concluded that, based upon the clinical progress notes and his own attempts to interview respondent, there was no evidence that respondent had shown any clinical change in his thought processes. Respondent still did not believe that he was mentally ill and did not see the need for his medication. In Dr. Moore's opinion, the respondent would stop taking his medication if he were discharged, thus allowing his mental state to deteriorate, with the result that violent or aggressive behavior would again become a facet of respondent's mental status. Dr. Moore based his opinion at least partially on the respondent's existing feelings of persecution and paranoia that had previously led to violent episodes.

Summarizing Dr. Moore's analysis, he believed that since respondent did not think that he was mentally ill, he would stop taking his medication if he were released; and further, since it was the medication that had controlled the violent outbursts, respondent could reasonably be expected to inflict serious harm on himself or others if he were released. We note that Dr. Calabio voiced the same concerns.

The respondent cites *People v. Nunn* (1982), 108 Ill. App. 3d 169, 438 N.E.2d 1342, for the proposition that the possibility that a patient may fail to take medication is not sufficient to require involuntary commitment. Unlike the respondent in *Nunn*, however, the respondent here has a history of refusing to take his medication, disobeying rules and engaging in violence. We have quite a different case here than the court did in *Nunn*. Although the respondent here stated that he had not refused to take his medication since his admission to CMHC, a period of about six months, and that he would take his medication upon release, we believe that respondent's history of refusal to take his medication, along with his statement of only two months earlier, as contained in Dr. Calabio's evaluation, that he did not believe he was mentally ill and did not require medication, presents a strong likelihood, not a mere possibility, that respondent would stop taking

his medication upon his release. We agree with Dr. Moore, therefore, that respondent could reasonably be expected to inflict serious harm on himself or others if he were to be released. We must conclude then that the jury's findings as to respondent's mental illness and the likelihood of his inflicting serious harm on himself or others were supported by the record and that the statutory requirements for the involuntary commitment of respondent were thus clearly and convincingly shown by the State, so that the trial court's decision to commit the respondent was not an abuse of discretion. We affirm the judgment of the trial court.

Affirmed.

KASSERMAN, P.J., and KARNS, J., concur.