Albert J. SULLIVAN, Plaintiff–Appellant,

v.

Mary FLANNIGAN, Superintendent, and Sam Parwatikar, Psychiatrist, Defendants–Appellees.

No. 91–3416.

United States Court of Appeals, Seventh Circuit.

Argued April 8, 1993.

Decided Nov. 1, 1993.

Howard B. Eisenberg (argued), Little Rock, AR, for plaintiff-appellant.

Deborah L. Ahlstrand, Asst. Atty. Gen. (argued), Chicago, IL, for defendants-appellees.

Before CUMMINGS and CUDAHY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

CUMMINGS, Circuit Judge.

The State of Illinois has forced prisoner Albert J. Sullivan to take mind-altering drugs against his will for the past five years. In this suit under 42 U.S.C. § 1983, he argues that he has a due process right to stop taking medication long enough to show the state that he does not need it. Illinois administers psychotropic drugs to Sullivan under Section 415.70 of the Department of Corrections Rules, using procedures similar to those approved by the Supreme Court in *Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178. While there is something disturbing about the prospect of a prisoner forever surrendering to prison doctors his right to be free of unwanted mind-altering drugs, we conclude that *Harper* sanctioned this possibility. We therefore hold that Illinois may constitutionally force Sullivan to take psychotropic drugs without allowing him to become drug-free to prove that he could do without them. We also hold that defendants have qualified immunity and hence are not accountable for treating Sullivan with drugs before the current *Harper*-type rules were enacted in Illinois.

I

The briefs provide only sketchy details of Sullivan's history. In 1968 he pled guilty to and began serving a 17-year sentence for armed robbery and rape. *People v. Sullivan*, 6 Ill.App.3d 814, 816, 286 N.E.2d 605 (1st Dist.1972). In 1973 he was transferred from prison to Menard Psychiatric Center, an Illinois Department of Corrections ("IDOC") facility for inmates who require psychiatric care. While at Menard and perhaps before as well (Parwatikar affidavit at 2, R. tab 30), he assaulted guards, inmates and nurses numerous times, and over a ten-year period, Menard doctors took Sullivan on and off of several different anti-psychotic drugs. When his imprisonment at IDOC ended in 1985, he was involuntarily committed to the care of the Illinois Department of Mental Health. *Sullivan v. Hay*, 140 Ill.App.3d 1007, 95 Ill.Dec. 327, 489 N.E.2d 889 (5th Dist.1986). Sometime between 1986 and 1988, the Department of Mental Health released Sullivan—and nine months later he was arrested for aggravated sexual assault. He claimed that the woman who charged him had demanded sadistic sex and had become angry when he could not perform to her satisfaction, but in spite of this defense, he was convicted and sentenced to 60 years in prison.

Sullivan was incarcerated at Stateville prison in February 1988, where doctors detected "a deterioration of plaintiff's mental health" (magistrate's report at A–28) and began giving him Haldol, an anti-psychotic drug.[1] In April 1988 Sullivan was transferred to Menard (his former home of many years), where Dr. Parwatikar, one of the defendants in this case, continued to force Sullivan to take large doses of Haldol. Two months later Sullivan filed a pro se complaint charging that Dr. Parwatikar and Mary Flannigan, the superintendent at Menard, were forcing him to take powerful drugs that caused him "constant dry mouth; nervousness; blurred vision; blurred speech; tiredness; weakness and other unbearable side effects." R. tab 1. He alleged that defendants were forcing drugs on him as punishment for an assault he had committed at Menard in 1983 (during his pre–1985 prison

---

1. Haldol is used to treat schizophrenia and other psychotic mental disorders. It alters the chemical balance of a patient's brain, and if effective it helps the patient to "organiz[e] his or her thought processes and regain[ ] a rational state of mind." *Harper*, 494 U.S. at 214, 110 S.Ct. at 1032. It also produces unpleasant side effects such as insomnia, restlessness, anxiety, drowsiness, depression, lethargy, confusion, vertigo, seizures, hallucinations, catatonic-like behavior, and "tardive dyskinesia" (spasms of the neck and face muscles). 1993 *Physicians' Desk Reference* at 1422–1424.

term) and "because of my black race, male sex, poverty and because I am a prisoner and mental patient and sex-offender." *Id.* Written in a strong staccato style, his claims were articulate and well-argued.

Sullivan's complaint initiated an unusual and ultimately time-consuming series of procedural events. After a year of motions and answers (Sullivan gained a lawyer), in June 1989 a magistrate judge considered defendants' motion for summary judgment and Sullivan's plea for a temporary restraining order (TRO). The magistrate found that Haldol produced severe side effects on Sullivan but denied his TRO motion because the drug was administered "by mental health professionals on the basis of valid, professional observations and considerations." A-28 (June 30, 1989). The district court agreed that Sullivan was not entitled to a TRO, but remanded the case for a determination of whether defendants denied Sullivan due process when they first forced him to take Haldol. Sullivan appealed the TRO denial in September 1989, and briefing was delayed pending the outcome of *Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, which promised to clarify the rights of prisoners who were given psychotropic drugs against their will.

*Harper,* decided in February 1990, established that prison inmates in the State of Washington had a liberty interest in refusing drug treatment that was protected under the due process clause of the Fourteenth Amendment. 494 U.S. at 221–222, 110 S.Ct. at 1036. The Supreme Court also held, however, that due process was satisfied where the inmate's treatment was ordered by a competent physician to protect the inmate or others, and the inmate could challenge the doctor's opinion in a hearing before a panel of doctors and prison administrators. *Id.* at 225–227, 110 S.Ct. at 1038–39. This decision prompted Illinois to adopt new procedures for involuntary medication of prisoners that mirrored the Washington state correctional rules approved by *Harper.* These new procedures were applied to Sullivan in August 1990 shortly before oral argument of his case. In light of these developments, we remanded for an analysis of Illinois' new rules. *Sullivan v.*

*Flannigan,* 918 F.2d 959 (7th Cir.1990). On remand both parties opted to forego further fact-finding and sought summary judgment. In September 1991 the trial judge found that Illinois' post-*Harper* procedures were constitutional and that defendants had qualified immunity for their pre-*Harper* treatment of Sullivan. Sullivan filed a timely appeal.

Over the years doctors have diagnosed Sullivan as suffering from mental illnesses variously characterized as paranoid delusions or schizophrenia. His current diagnosis is for "bipolar affective disorder" (not explained in the briefs), which means that he has severe mood disturbances that swing between mania and depression. *Diagnostic and Statistical Manual of Mental Disorders (III–R)* at 225, 452–453. Sullivan's relationship with his current physician is also noteworthy. In April 1989 he explained to the magistrate: "About every three weeks, * * * I ask [Dr. Parwatikar] to take me off of the anti-psychotic drugs and he say, no, I can't do that because of your past record." Tr. at 11. Sullivan also noted, "We've never had a long conversation. He's the type of psychiatrist his mind is made up about me. * * * Talking to him is like talking to a brick wall. He feels that I need the medication as long as I live." Tr. at 22. Dr. Parwatikar, for his part, stated: "The need for Mr. Sullivan being on anti-psychotic medication is quite clear from the past history. During the period of 1972 thru 1982 * * * [he] had 59 assaultive episodes * * *. Thus, it is quite essential that Mr. Sullivan must be on some sort of anti-psychotic medication for the rest of his life." Affidavit at 2, R. tab 30. Since 1988, Sullivan's Haldol doses have been gradually reduced from 100 mg per day to 8 mg per day as of May 7, 1991. Dr. Parwatikar has sworn that "Sullivan is mentally ill and enforced medication is necessary for his treatment" and "necessary to prevent [his] becoming a danger to others." Affidavit at 1, R. tab 60.

There are two legal issues in this case; each raises separate factual questions. First we must determine whether defendants have qualified immunity for their pre-*Harper* treatment of Sullivan. In his 1989 hearing

before the magistrate, Sullivan argued pro se that his captors denied him due process:

> I request an examination by an independent psychiatrist, who is not on the state payroll, because the way it is now, at the Menard Psychiatric Center, the Warden and the psychiatrist have the final say. If they say I'm paranoid schizophrenic or if they say I'm psychotic or neurotic, I have no one to appeal to * * *. They have absolute power over the patients, over the prisoners there. They have absolute power. * * * That's a deprivation of due process * * *.

Tr. at 16. *Harper* made clear that Sullivan was not entitled to a review by a psychiatrist from outside the prison, 494 U.S. at 233, 110 S.Ct. at 1042; thus Sullivan's claim turns on whether defendants' pre-*Harper* acts violated some other established due process right that existed at that time. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396; *Williams v. Anderson*, 959 F.2d 1411, 1414 (7th Cir.1992).

Second, we must determine whether Illinois' post-*Harper* rules governing involuntary medication of prisoners are unconstitutional as applied to Sullivan. Sullivan claims that he has the right to be drug-free long enough to satisfy his jailers that he can behave without being forced to take anti-psychotic drugs, and he stresses that since he returned to Menard his behavior has been exemplary. He developed this theory of his case pro se in 1989:

> Since I've been back these past three years * * * I've not been in one fight. I've not had one incident, argument with anybody. They're still talking about '72 to '82, things I did way back then. * * * I'm a new man now. I'm older and wiser. I'm forty-four years old now, and I'm able

to change my behavior and my habit because I'm not a robot.

Tr. at 18. Sullivan concluded, "I want to be taken off of all anti-psychotic drugs and given an opportunity to prove I don't need it. How can I prove I don't need it if you never take me off of it?" Tr. at 20. His able attorney, Dean of the Arkansas law school at Little Rock, has not needed to embellish the power of Sullivan's pro se argument.

To resolve Sullivan's claims this Court must review Illinois' pre- and post-*Harper* procedures and study *Harper* to determine the contours of a prisoner's right to refuse psychotropic medication. We review the grant of summary judgment *de novo* and uphold the district court's judgment if there are no disputed issues of material fact and the defendants must prevail as a matter of law. *Sherman v. Four County Counseling Center*, 987 F.2d 397, 400 (7th Cir.1993).

## II

The watershed date in this case is February 1990, when the Supreme Court decided *Harper*. Before 1990 Illinois provided for medication of prisoners without their consent under a 1986 IDOC Administrative Directive.[2] This policy required a licensed doctor to find that treatment was necessary for one of four reasons—but all four prongs of the regulation sought to protect the inmate from harm, or from harming others. The rule also required involuntary treatment to be approved by a senior administrative officer at the institution. The record shows that Menard followed these rules when medicating Sullivan between 1988 and 1990. Dr. Parwatikar stated in a 1989 affidavit that Sullivan needed Haldol because he had been violent during his earlier incarceration at

---

2. The policy provided (Exhibit D at R.30):
   Medical treatment, including medication, may be given against an inmate's will where approved by the Chief Administrative Officer of the Duty Administrative Officer when in the opinion of an Illinois licensed physician immediate treatment is required:
   (1) To protect the inmate from a condition threatening to cause death, damage or impairment of bodily functions, or disfigurement, and the inmate is incapable of giving consent.

   (2) To prevent the inmate from causing serious harm to himself or others.
   (3) Where death of the inmate or serious permanent bodily injury is likely to result in the near future if treatment is not provided.
   (4) Where the inmate's mental health has deteriorated and treatment is necessary to prevent further deterioration and whose deteriorated condition poses a threat to himself or others.

Menard (before 1985). Superintendent Flannigan stated that she approved of the doctor's decision. The record also shows that Sullivan was given 100 mg of Haldol a day at Stateville prison between February and April 1988 until he returned to Menard, however, and the reasons for this dose are more obscure. There is no evidence that he was violent during this brief stay at Stateville, or that authorities there knew about his aggressive record from his first imprisonment at Menard. Sullivan himself thought that a Stateville psychiatrist decided to drug him heavily only because Sullivan wanted to run for president.[3] Since Sullivan does not argue that any particular part of his treatment from 1988 to 1990 violated Illinois' then-existing procedures, however, we will assume that the state followed its own rules and move on to the question of whether those rules violated Sullivan's constitutional rights.

■ Defendants argue that they enjoy qualified immunity from suit for their pre-*Harper* actions because they treated Sullivan under a valid administrative rule that did not violate his known rights. "Qualified immunity" shields government officials from liability for discretionary acts that do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738. The right must have been concrete enough to notify potential defendants that their conduct was probably unlawful. *Henderson v. DeRo-*

*bertis,* 940 F.2d 1055, 1059 (7th Cir.1991). Sullivan argues that before 1988 when he was first given Haldol, the law clearly established that a state could not deny his right to refuse medication without affording him due process, *Vitek v. Jones,* 445 U.S. 480, 491–494, 100 S.Ct. 1254, 1262–64, 63 L.Ed.2d 552 (1980); *Youngberg v. Romeo,* 457 U.S. 307, 316, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982); *Lojuk v. Quandt,* 706 F.2d 1456, 1466 (7th Cir.1983), and that Illinois did not give him due process when it forced him to take anti-psychotic drugs. *Chambers v. Ingram,* 858 F.2d 351, 359 (7th Cir.1988); *Bee v. Greaves,* 744 F.2d 1387 (10th Cir.1984), certiorari denied, 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334. He is right on the first point. Cases before the 1990 *Harper* ruling recognized that prisoners had a liberty interest in refusing medication—thus the question becomes whether those cases also established what "due process" was required to abridge this liberty. We must decide, in other words, whether Illinois' pre-*Harper* procedures for administering drugs to prisoners against their will clearly failed to give Sullivan due process under the constitutional standards of 1988–1990. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

The cases Sullivan relies on actually suggest that Illinois' pre–1990 procedures for involuntary medication of prisoners were constitutional. As of 1990, this Circuit had not delineated any clear "due process" requirements that states had to follow to force

3. Sullivan's explanation of this ambition is significant:

[Sullivan]: I got sent from Stateville to Menard simply because I was running for President, and I realize that the law says that anybody convicted of a felony can't run for President. * * * [W]hat I was going to do was challenge that law in the federal courts on the grounds of discrimination that a former prisoner can't run for President. * * * Before I got transferred, [a Stateville psychiatrist] gave me some Haldol, a hundred milligrams * * *.
[Magistrate]: I've heard people say they ought to check somebody's head when they want to run for President but * * * I just didn't know they went that far.
[Sullivan]: See, I read about it in a newspaper. A long time ago, I read there was a guy who was a member of the Socialist Party * * * [who] ran for President on a write-in ticket, you know.

[Magistrate]: Let me stop you here.
Tr. at 10. If Sullivan had been able to continue, he might have reminded the magistrate that in 1920, Eugene Debs received almost a million votes as a Socialist write-in candidate for president—while serving a ten-year sentence for subversive advocacy! *Debs v. United States,* 249 U.S. 211, 39 S.Ct. 252, 63 L.Ed. 566 (1919); Harry Kalven, Jr., *Ernst Freund and the First Amendment Tradition,* 40 U.Chi.L.R. 235–239 (1973). Debs was in prison for expressing political views (he opposed U.S. involvement in World War I) that are now protected by the First Amendment. *Id.* Therefore Sullivan's seemingly crazy idea—to run for president from prison—was motivated in part by his awareness of an historical event that raises complex constitutional issues.

drugs on inmates. In *Chambers,* we upheld a directed verdict where a prisoner charged that a forced administration of Haldol violated his rights. 858 F.2d at 359–360. *Chambers* recognized an inmate's liberty interest in refusing psychotropic drugs, but found that a doctor's decision to give the drug to a possibly suicidal inmate was not a due process violation because the doctor was responding to an emergency. *Id.* We did not discuss the procedures that might be required to give prisoners regular involuntary doses of Haldol. Similarly, in *Lojuk,* we expressly declined to outline procedural requirements for involuntary electro-convulsive therapy given to a patient under the care of the Veteran's Administration. 706 F.2d at 1467.

Before 1990 the Supreme Court reviewed the due process rights of mentally ill wards of the state and concluded that a treatment decision made by a qualified physician was "presumptively valid." *Youngberg,* 457 U.S. at 323, 102 S.Ct. at 2462. This case left open the possibility that prison inmates' due process rights would involve nothing more than a professional determination by a competent doctor that forced medication was necessary for the prisoner's well-being—the very procedure that Illinois applied to Sullivan. And while an earlier Supreme Court case required more stringent procedural safeguards to justify an inmate's transfer from prison to a mental illness ward, *Vitek,* 445 U.S. at 494–495, 100 S.Ct. at 1264, this decision had not been extended to involuntary medical treatment. Sullivan fails to persuade us that under pre–1990 Supreme Court or Seventh Circuit case law, Illinois' procedures denied him clearly recognized rights to due process.

Outside this Circuit, pre-*Harper* case law on forced drugging of prisoners pointed in conflicting directions, which again defeats Sullivan's argument that defendants' 1988–1990 procedures violated clearly established constitutional norms. *Bee v. Greaves* held that "forcible medication with anti-psychotic drugs is [not] 'reasonably related' * * * to the concededly legitimate goals of jail safety and security," 744 F.2d at 1395, and suggested that after doctors found that a prisoner needed psychotropic drugs, prison officials should review less drastic alternatives. *Id.* at 1396. But another court applied *Youngberg* to a prison setting and found that a professional decision that medication was in an inmate's best interest satisfied due process. *United States v. Charters,* 863 F.2d 302, 307–309 (4th Cir.1988) (en banc); see *Rennie v. Klein,* 720 F.2d 266, 269 (3rd Cir. 1983) (en banc).

Two recent decisions by this Court also show that defendants are entitled to qualified immunity for their pre–1990 treatment of Sullivan. *Sherman v. Four County Counseling Center,* 987 F.2d 397 (7th Cir.1993), involved an Indiana statute that provided for the temporary involuntary commitment of persons thought to be mentally unstable. The plaintiff had been given a forced dose of Haldol by a private treatment center after a police officer and a consulting psychiatrist arranged to have him temporarily committed under the Indiana statute. These events occurred in 1989, and we held that the procedural requirements of the law at that time were unclear. *Id.* at 409 ("a reasonable institution could not have known what procedures were required before Sherman was medicated in 1989"). *Williams v. Anderson,* 959 F.2d 1411, 1416 (7th Cir.1992), reached the same conclusion regarding the forced administration of Haldol to a prisoner in 1985. In sum, Illinois' pre–1990 procedures for involuntary medication of prisoners ensured that Sullivan would not be drugged unless a competent physician and the warden decided that he needed medication to prevent harm to himself or others. This policy did not violate clearly established constitutional rights, and thus defendants have qualified immunity for their treatment of Sullivan before 1990. *Sherman,* 987 F.2d at 409.

### III

Perhaps to resolve some of the conflicting mandates in the jurisprudence discussed above, in 1990 the Supreme Court decided *Harper,* 494 U.S. 210, 110 S.Ct. 1028, which reviewed a Washington state policy on involuntary medication of prisoners. This policy allowed prison authorities to drug inmates against their will only if a physician determined that the inmate needed the medication

and suffered from a mental disease, and was gravely disabled or presented a risk of serious harm to himself or others. Inmates who refused treatment could request a hearing before a panel to review the decision to administer involuntary medication. The panel was composed of a psychiatrist, psychologist and superintendent, none of whom could be involved in the inmate's day-to-day care. Inmates had a right to attend the hearing with the assistance of a lay advisor, present witnesses, and cross-examine the staff. Continuous treatment could only occur with periodic review by a physician, and prisoners were entitled to a new hearing every 180 days. *Id.* at 216–217, 110 S.Ct. at 1033–34. *Harper* recognized that prison inmates had a Fourteenth Amendment right to refuse treatment. But the Court reasoned that the right to be free of medication must be balanced against the state's duty to treat mentally ill inmates and run a safe prison, see *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64, and concluded that Washington's procedures did not deprive prisoners of the right to refuse treatment without adequate due process. *Id.* 494 U.S. at 227, 110 S.Ct. at 1039.

Shortly after *Harper* was decided Illinois adopted new rules for the involuntary medication of prisoners that were substantially similar to Washington's. 20 Ill.Admin.Code § 415.70. Illinois' rules require the same threshold showing to medicate an inmate (*i.e.* mental illness and harm to self or others), but its review procedure is somewhat different. Illinois has established a two-person "treatment review committee" composed of a physician other than the treating physician and a prison administrator (Washington used three-person panels with a psychiatrist and a psychologist). Like the review panels in *Harper,* however, Illinois' panel hears the prisoner's appeal, and the prisoner has the right to a staff assistant, to present witnesses, and to 24 hours' notice. Illinois adds a further level of review by the Agency Medical Director, who must approve the treatment review committee's decision within five days of the prisoner's appeal—but during this time the prisoner receives whatever medication was ordered by the treating phy-

sician and approved by the review committee.

As applied to Sullivan in August 1990, the process worked as follows. Dr. Parwatikar found that Sullivan needed to be treated with Haldol and that he would be dangerous to others without the drug. Sullivan then appeared before a committee composed of Dr. David Vidal and Assistant Warden Derry Vinyard, who approved Dr. Parwatikar's prescription in a one-page written report. Sullivan appealed to Agency Medical Director Ronald Shansky, who prepared a more comprehensive written explanation of why he supported the decision to medicate Sullivan. P. Brief at A. 36–38. He stressed that Sullivan exhibited warning signs of aggressive behavior on his currently low dose of Haldol, signs that had foreshadowed violent assaults in Sullivan's earlier (pre–1985) stay at Menard, and noted that Sullivan had no understanding of his illness. Significantly, he also noted that it would be medically dangerous for Sullivan to go off Haldol altogether. Dr. Shansky explained that if Sullivan's regular low-level doses were discontinued, he would require very large doses (with severe attendant side effects) to restore his current stable state of mind. Dr. Shansky concluded that it was in Sullivan's best interest to continue taking Haldol, and that the drug would prevent him from committing an unpredictable assault.

■ Sullivan argues that Illinois' post-*Harper* procedures on involuntary medication of prisoners are unconstitutional because the state has not allowed him to prove that he can function without danger to himself or others when he is not on Haldol. He correctly observes that *Harper* made it the state's burden to justify forced drugging of prisoners and allowed prisoners to present evidence in their own defense. Sullivan stresses that he has not become assaultive, aggressive or disruptive since receiving Haldol after his return to Menard, and thus the only remaining evidence he can offer is his behavior off the drug. "How is the prisoner ever to overcome his past?" he wonders, and this plaintive argument has a common-sense appeal. He asks us to find under *Harper* and *Riggins v. Nevada,* —— U.S. ——, 112

S.Ct. 1810, 118 L.Ed.2d 479, that he has the right to be drug-free long enough to convince Illinois that he does not need medication.

Sullivan faces an uphill battle, however, because Illinois' post–1990 procedures are quite similar to those approved by *Harper.* Sullivan must show that Illinois' current procedures are different in some way that runs afoul of *Harper's* analysis of the right to refuse medication. The difference he stresses is a small one: Washington required that prisoners receive 24 hours' notice of their hearing, during which time they could not be forced to take medication. 494 U.S. at 216, 110 S.Ct. at 1033. Illinois grants prisoners 24 hours' notice of their hearing but does not allow them to refuse their drug treatments during this period. Sullivan argues that a drug-free notice period was a critical part of the Washington policy approved by *Harper.*

Initially, we note that Washington did not grant inmates the right to a drug-free hearing, as Sullivan would have us conclude. Washington's 24–hour notice period did not allow inmates to become drug-free during their review hearings because (as the dissent in *Harper* observed) a single dose of antipsychotic drugs can last up to a full month. 494 U.S. at 256, 110 S.Ct. at 1054. Furthermore, the prisoner in *Harper* had been under involuntary medication for eight years by the time the Supreme Court rendered its opinion, and Washington had not allowed him to become drug-free for any of the treatment hearings that the Supreme Court upheld as constitutional. *Harper* observed that "the risks associated with antipsychotic drugs are for the most part medical ones, best assessed by medical professionals." 494 U.S. at 233, 110 S.Ct. at 1042. This precept is not compatible with the "drug-free hearing" requirement urged by Sullivan, for such a rule would force prison doctors to diagnose an inmate by withdrawing medicine that the prisoner may need. We therefore must conclude that *Harper* does not require the state to allow an inmate to refuse involuntary medication long enough to show that he can do without it.

*Harper* emphasized several aspects of an inmate's right to refuse drug treatment. First, to administer involuntary treatment the state must find that medication is in the prisoner's medical interest (independent of institutional concerns). 494 U.S. at 227, 110 S.Ct. at 1039. Second, the tribunal or panel that reviews a treating physician's decision to prescribe forced medication must exercise impartial and independent judgment, taking account of the inmate's best interest. *Id.* at 222, 233, 110 S.Ct. at 1036, 1042; compare *id.* at 250–253, 110 S.Ct. at 1051–53 (Stevens, J., dissenting). Third, the prisoner must be able to argue capably before a review tribunal that he does not need forced medication. *Id.* at 233, 110 S.Ct. at 1042. If the state failed to meet these requirements in a particular case, the prisoner could argue that he was denied *Harper's* protections.

In the present case, however, all these core protections are present. Dr. Parwatikar has regularly affirmed, as required by the Illinois rules, that forced Haldol administration is in Sullivan's medical interest. R. tab 60. Agency Medical Director Shansky also noted that taking Sullivan off Haldol altogether would be medically improper because Sullivan would need debilitating doses of the drug to regain his current state of mind. Furthermore, Dr. Shansky's report on Dr. Parwatikar's initial diagnosis was thorough and well-reasoned; it shows that he studied Sullivan's record and exercised his independent judgment. If the approvals of the review committee or medical director appeared to be a rubber stamp of the treating doctor's diagnosis, we would have a different case. Finally, Dr. Parwatikar has sworn that "the drugs administered * * * would not cause any difficulties with cognition and communication which would prevent [Sullivan] from participating in a hearing on the issue of whether medicine should be enforced." R. tab 60. If his medication left Sullivan unable to speak in his own defense or robbed him of the capacity to think cogently, we might question whether Illinois' hearing could afford him due process under *Harper.* Here, however, no evidence suggests that the current rather small doses of Haldol administered to Sullivan disrupt his ability to defend himself.

The 24–hour drug-free notice period in *Harper* is significant not for inmates like Sullivan, who are on medication that does not wear off in a day, but for inmates who are

challenging forced drugs for the first time. We postpone for another day the question whether Illinois may force drugs on a previously unmedicated inmate before that inmate has exhausted his appeals—for this issue is not raised by the facts of Sullivan's appeal.

The final arrow in Sullivan's quiver is *Riggins v. Nevada,* a recent case reviewing a defendant's right to refuse psychotropic medication while on trial. —— U.S. ——, 112 S.Ct. 1810, 118 L.Ed.2d 479. While in pretrial custody for murder, Riggins voluntarily began taking Mellaril, an anti-psychotic drug, on the advice of a doctor at the county jail. After he was found competent to stand trial, he requested that the court allow him to stop taking Mellaril until the case was over. Nevada asked the court to force Riggins to continue his Mellaril doses because he would become incompetent without them. The trial judge decided that Riggins' defense would not be prejudiced if he were forced to take Mellaril, and the doses continued throughout trial. The Supreme Court ordered a new trial because "the State [was] obligated to establish the need for Mellaril and the medical appropriateness of the drug." —— U.S. at ——, 112 S.Ct. at 1815.

Sullivan claims that the committees created by Illinois to review forced medication of prisoners are analogous to a judicial tribunal. This premise leads him to assert that the state violated *Riggins* when it forced him to defend himself at his hearing while on drugs. As *Harper* makes clear, however, treatment review panels employed by Washington and Illinois are medical, not judicial, in character: "A State may conclude with good reason that a judicial hearing will not be as effective * * * as administrative review using medical decisionmakers." 494 U.S. at 233, 110 S.Ct. at 1042. *Riggins* itself rebuts Sullivan's position: "Nevada certainly would have satisfied due process if the prosecution had demonstrated * * * that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of Riggins' own safety or the safety of others." *Id.* In the present case, the medical review panel made the very determination that was lacking in *Riggins*—a finding that forced medication was in Sulli-

van's best interest. *Riggins* cannot be read to require Illinois to afford its inmates regular drug-free hearings. It is worth noting, however, that *Riggins* requires something more than *Harper.* When the right to stand trial is at issue, the state must consider less intrusive alternatives to forcing drugs upon the accused. Sullivan does not argue that this requirement should extend beyond *Riggins* to *Harper*-type issues involving the treatment of mentally ill prisoners—but we read *Riggins* to suggest that such an approach is desirable.

## IV

Illinois has established administrative rules governing the involuntary medication of prisoners that closely parallel those approved by the Supreme Court in *Harper,* and these rules have not violated Sullivan's due process rights under the Constitution in the present case. Because case law before that 1990 decision did not require clear procedures to support a state's decision to drug prisoners against their will, defendants have qualified immunity for their pre-*Harper* treatment of Sullivan. Under Illinois' 1990 regulations, Sullivan remains entitled to regular hearings before a treatment review committee, where he can argue that he does not need mind-altering drugs to behave in a prison environment. How such hearings will further enlighten doctors about Sullivan's need for medication is a question that the Supreme Court has surrendered to the medical profession. From a lay perspective it seems highly unlikely that Sullivan's current keepers will ever change their minds about him—which is not to say that the doctors are wrong, but only to observe that future hearings for Sullivan may be a pointless formality.

AFFIRMED.

CUDAHY, Circuit Judge, concurring.

I believe that the majority has correctly analyzed a complex problem in light of *Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), and *Riggins,* —— U.S. ——, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992), and reached a perhaps inescapable result. The analysis and result rest, however, on Dr. Parwatikar's assurance that "the drugs ad-

ministered * * * would not cause any difficulties with cognition and communication which would prevent [Sullivan] from participating in a hearing on the issue of whether medicine should be enforced." Op. at 598. Sullivan seems to take exception to these assurances, in principle at least, by adopting the position that one cannot effectively address one's requirement for psychotropic drugs as long as one is subject to their influence and control. As a matter of philosophy—if not of science—this position is not without some appeal. Nonetheless, I can find no clear place for it among the decided cases and it may not lend itself to practical application here.